## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PAUL LEE and JOHN DANIEL, Derivatively on Behalf of CLOUDERA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | Case No: |
| MARTIN COLE, PAUL CORMIER, PETER FENTON, KIM HAMMONDS, KEVIN KLAUSMEYER, MIKE STANKEY, THOMAS J. REILLY, ROBERT BEARDEN, ROSEMARY SCHOOLER, JIM FRANKOLA, and MICHAEL A. OLSON, | ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) ) | |
| and, | ) ) ) ) | |
| CLOUDERA, INC., | ) ) ) | |
| Nominal Defendant. | ) ) ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Cloudera, Inc. ("Cloudera" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Cloudera with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference

transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Cloudera against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, unjust enrichment, and violations of §§ 10(b) and 20(a) of the Exchange Act that occurred between April 28, 2017 to the present (the "Relevant Period") and have caused substantial harm to Cloudera.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court has exclusive subject matter jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each of the Defendants.  Each Defendant has sufficient contacts with Delaware in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this District under Section 27 of the Exchange Act (the "Exchange Act") (15 U.S.C. §78aa), as well as 28 U.S.C. §1391(b).

## PARTIES

### A.     Plaintiffs

5.     *Plaintiff Paul Lee* is, and was at relevant times, a shareholder of Cloudera.

Plaintiff Lee will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.      ***Plaintiff John Daniel*** is, and was at relevant times, a shareholder of Cloudera. Plaintiff Daniel will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**B.      Nominal Defendant**

7.      Nominal Defendant Cloudera is a Delaware-incorporated company.

**C.      Director Defendants**

8.      ***Defendant Martin Cole*** ("Cole") has served as a member of the Company's Board since September 2014.  Defendant Cole is a member of the Chair of the Nominating and Governance Committee and the Compensation Committee.

9.      ***Defendant Paul Cormier*** ("Cormier") has served as a member of the Company's Board since January 2019.  Defendant Cormier is a member of the Compensation Committee. He is also a member of the Mergers & Acquisition Committee.  In addition, Defendant Cormier served on the Hortonworks board of directors from October 2011 until it merged with Cloudera in January 2019.

10.      ***Defendant Peter Fenton*** ("Fenton") has served as a member of the Company's Board since January 2019.  Defendant Fenton is a member of the Audit Committee.  He is also the Chairman of the Mergers & Acquisition Committee.  In addition, Defendant Fenton served on the Hortonworks board of directors from July 2011 until it merged with Cloudera in January 2019

11.      ***Defendant Kimberly Hammonds*** ("Hammonds") has served as a member of the Company's Board since March 2017.  Defendant Hammonds is the Chair of the Nominating and

Governance Committee.  She is also a member of the Mergers & Acquisitions Committee.

12.     **Defendant Kevin Klausmeyer** ("Klausmeyer") has served as a member of the Company Board since January 2019.  Defendant Klausmeyer is the Chair of the Audit Committee and is a member of the Nominating and Governance Committee.  In addition, Defendant Klausmeyer served on the Hortonworks board of directors from August 2014 until it merged with Cloudera in January 2019.

13.     **Defendant Mike Stankey** ("Stankey") has served as a member of the Company's Board since February 2017.  Defendant Stankey is a member of the Audit Committee.  He is also the Chairman of the Compensation Committee

14.     **Defendant Thomas J. Reilly** ("Reilly") has served as a member of the Company's Board and as Chief Executive Officer ("CEO") since June 2013.

15.     **Defendant Robert Bearden** ("Bearden") has served as a member of the Company's Board since January 2019.  In addition, Defendant Bearden co-founded Hortonworks, served as Hortonworks' Chief Executive Officer from February 2012 until it merged with Cloudera in January 2019, as well as from April 2011 to June 2011, and served as Hortonworks' President from June 2018 to January 2019.  Defendant Bearden also served as a member of the Hortonworks board from April 2011 to January 2019.

16.     **Defendant Rosemary Schooler** ("Schooler") has served as a member of the Company Board since December 2017.  Schooler is Corporate Vice President and General Manager of Data Center Sales for Intel.  Defendant Schooler owns 9.5% of the Company's outstanding stock.

17.     Defendants Cole, Cormier, Fenton, Hammonds, Klasumeyer, Stankey, Reilly, Bearden and Schooler are herein referred to as the "Director Defendants."

4

**Officer Defendants**

18.     *Defendant Jim Frankola* ("Frankola") was Cloudera's Chief Financial Officer ("CFO") throughout the Relevant Period.

19.     *Defendant Michael A. Olson* ("Olson") founded Cloudera and served as its Chief Strategy Officer ("CSO") and Chairman of the Board until January 3, 2019.

## DUTIES OF DEFENDANTS

20.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Cloudera, Defendants owed and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Cloudera in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Cloudera and its investors.

21.     Each director of the Company owes to Cloudera and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

22.     To discharge their duties, the officers and directors of Cloudera were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Cloudera were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Cloudera conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

23.      Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of

due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cloudera, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

24.     The Audit Committee is charged with the following duties:

The principal responsibilities and duties of the Committee in serving the purposes outlined in the "Purpose" section of this Charter are set forth below. These duties are set forth as a guide with the understanding that the Committee will carry them out in a manner that is appropriate given Cloudera's needs and circumstances. The Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

The Committee will:

### Financial Statements and Disclosures

1. Review and discuss with management, Cloudera's quarterly results and discuss the related earnings press release prior to distribution to the public. Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financing information.

2. Review Cloudera's quarterly and annual financial statements, as well as analyses prepared by management or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

3. In connection with the Committee's review of the annual financial statements:

    • discuss with the Independent Auditors and management the financial statements and the results of the Independent Auditors' audit of the financial statements;

• discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"). These discussions should include an overview of the planned scope and timing of the audit, the Independent Auditors' judgments about the quality and appropriateness of Cloudera's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in Cloudera's financial statements, the representations the Independent Auditors are requesting from Cloudera's management, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information;

• discuss with Cloudera's management and the Independent Auditors Cloudera's selection, application and disclosure of critical accounting policies and practices; and

• review Cloudera's specific disclosure under Management's Discussion and Analysis of Financial Condition and Operation.

4. Recommend to the Board whether the annual financial statements should be included in Cloudera's Annual Report on Form 10-K.

5. In connection with the Committee's review of the quarterly financial statements:

• discuss with the Independent Auditors and Cloudera's management the results of the Independent Auditors' SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements;

• discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with Cloudera's management and the Independent Auditors; and

• review Cloudera's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.

6. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information). Review the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of Cloudera.

\*   \*   \*

**MINUTES AND REPORTS**

The Committee will maintain written minutes of its meetings and copies of its actions by written consent and will cause such minutes and copies of written consents to be filed with the minutes of the meetings of the Board. The Chair will report to the Board from time to time with respect to the activities of the Committee, including on significant matters related to the Committee's responsibilities and the Committee's deliberations and actions. The minutes of the Committee and actions by the unanimous written consent of the Committee members will be made available to the other members of the Board.

## BACKGROUND

25.     Cloudera is a software company specializing in the provision of data management, machine learning, and advanced analytical tools to businesses. Its chief product platform is a hybrid open source software, or "HOSS," model which combines the Company's proprietary software with open source technology, most notably the Apache Software Foundation's ("ASF") open-source Hadoop software.  The Company offers a suite of applications through its HOSS platform that allows its customers – generally large enterprises – to collect, store, organize, and analyze large amounts of data to improve their businesses.

26.     The Company has two primary revenue segments: (i) subscription; and (ii) services. Cloudera sells subscriptions to businesses for the use of its platform and products.  The subscriptions are generally for one to three years in length, and Cloudera recognizes subscription revenues ratably over the subscription period.  Servicing revenues are derived from professional services that the Company provides to help companies implement and use their subscriptions. The great majority of Cloudera's revenues are subscription based. For example, approximately three-fourths of the Company's total revenues were from subscriptions in fiscal 2017.  The recurring nature of these payments over an extended time frame, and the proportionality of related service revenues, provided the Company and its management with great visibility into

current and expected revenue trends. In addition, a substantial amount of bookings the Company

sells during a quarter get billed in the subsequent quarter, providing Cloudera and its

management with even greater insight into existing revenue trends.

27. In the years since its founding, the Company grew to become one of the largest

data analytics firms servicing large enterprises in the world. Between its fiscal 2015 and fiscal

2017, the Company's total annual revenues increased approximately 140%, from $109 million to

more than $261 million. As of January 31, 2017, the Company also counted among its customers

approximately 500 members of the so-called "Global 8000," a list of the largest corporate

enterprises globally.

28. It was in this context of great optimism and growth that Cloudera went public in

an initial public offering in April 2017 (the "IPO"), selling 17.25 million shares of common

stock (including the exercise of the underwriters' overallotment option) at $15 per share and

raising over $258 million in gross offering proceeds. In IPO offering documents, and throughout

the Relevant Period, Defendants represented that the Company was on the cusp of rapid

expansion, as Cloudera grew its customer base – particularly among the Global 8000 and other

large organizations – and successfully implemented its "land and expand" business plan to grow

revenues from its existing customers.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### The Company's IPO

29. On April 28, 2017, Defendants caused the Company to file its prospectus on Form

424B4 for the IPO ("IPO Prospectus"). The IPO Prospectus highlighted the Company's rapid

historical growth and claimed that these trends would continue following the offering. For

example, the IPO Prospectus stated that the Company's revenues had increased from $166

million in fiscal 2016 to $261 million by fiscal 2017, "representing year-over-year growth in revenue of 57% for our most recent fiscal year."  The IPO Prospectus further stated: "We have experienced rapid growth in recent periods and expect our growth to continue."  The IPO Prospectus represented that the Company's HOSS platform was "the most widely adopted big data platform, with a growing range of applications being built on it."

30.     Also, the IPO Prospectus claimed that the Company "will further expand [its] customer opportunity through the continued growth in use cases and packaged solutions, the expansion of our partner ecosystem and the proliferation of skills, driven by ease of use and accelerating adoption of the cloud." The IPO Prospectus claimed that Cloudera was "only beginning to penetrate [its] market opportunity with Global 8000 companies and public sector entities," and would use the IPO proceeds to fund the Company's "expected growth" following its transition to a public company.

31.     The IPO Prospectus stated that the Company's focus on the world's largest businesses gave it a competitive advantage and ample opportunities to continue to grow its business.  It stated in relevant part:

> We market and sell our platform to a broad range of organizations, although we focus our selling efforts on large enterprises, primarily the Global 8000, as well as large public sector organizations. ***We target these organizations because they capture and manage the vast majority of the world's data and operate highly complex IT environments, and our enterprise-grade platform has the greatest opportunity to benefit these organizations. Our total number of Global 8000 customers grew from 255 as of January 31, 2015 to 381 as of January 31, 2016 and grew to 495 as of January 31, 2017. For the fiscal years ended January 31, 2015, 2016 and 2017, revenue from our Global 8000 customers represented 61%, 71% and 73% of total revenue, respectively, based on the Global 8000 constituents as of November 1, 2016.***  For fiscal 2015, 2016 and 2017, revenue from our public sector, including large public sector, customers represented 11%, 9% and 10% of total revenue, respectively.  [Emphasis added].

32.     The IPO Prospectus highlighted the Company's "land and expand" business

strategy, which it claimed would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform." Thus, after the initial sale, Cloudera would continue to "work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments." Similarly, the IPO Prospectus stated that Cloudera was committed to "expand[ing] [its] category leadership in open source data management" and "expanding [its] strategic partnerships and alliances, to acquire new customers and increase penetration among existing customers," with a "business model focuse[d] on maximizing the lifetime value of a customer relationship."

33.     Importantly, the IPO Prospectus represented that upfront investments and associated costs would decrease as more and more customers adopted Cloudera products. For example, it stated that "over time, as [Cloudera's] customer base grows and a relatively higher percentage of [its] subscription revenue is attributable to renewals or greater usage among existing customers relative to new customers, associated sales and marketing expenses and other allocated upfront costs as a percentage of revenue will decrease." This it claimed, in turn, would ultimately allow Cloudera to generate positive cash flows and profits.

34.     Following the IPO, Defendants continued to represent that Cloudera's "land and expand" model was working. For example, on June 8, 2017, Defendants caused the Company to issue a press release announcing its 1Q18 financial results, stating that the Company had achieved total revenues of $79.6 million (a 41% increase) and subscription revenue of $64.7 million (a 59% increase) for the quarter. The Company also reported positive $5 million in cash flow for the quarter due to strong collections.

35.     On the earnings call to discuss the 1Q18 results, Defendant Reilly stated in his prepared remarks: "This quarter we had some great new customer wins while some key existing customers expanded their utilization of our platform through additional use cases."

36.     On the same call, Defendant Frankola (Cloudera's Chief Financial Officer ("CFO")) represented that Cloudera was successfully, expanding revenues derived from existing customers.  He stated in relevant part:

> [W]e benefit from multiple growth vectors.  As customer data grows revenue grows.  As new use cases are deployed revenue grows.  And as partners build applications on our platform revenue grows. Note that a relatively small portion of revenue relates to professional services and training which are focused on ensuring customer success and driving expanded use of our platform.

37.     Defendant Frankola also highlighted the Company's 142% net expansion rate in 1Q19, and stated that Cloudera still had "plenty of room for growth within the segment" as it had only "penetrated only about 6% of the Global 8,000 and have thus far captured just a small portion of our customers' data-related spending."

38.     The next day, Cloudera filed its 1Q18 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

39.     On September 7, 2017, Defendants caused the Company to issue a press release announcing its 2Q18 financial results, stating that the Company had achieved total revenues of $89.8 million (a 39% increase) and subscription revenue of $74 million (a 46% increase) for the quarter.  Defendant Reilly was quoted in the press release as stating: "In our fiscal second quarter, we outperformed on sales, customer acquisition, customer expansion and cash flow objectives."

40.     On the earnings call to discuss the 2Q18 results, Defendant Reilly stated in his prepared remarks: "We are reporting a strong second quarter, driven by much of the new product

innovation we've recently announced."  Defendant Reilly further stated: "In Q2, we executed well as a company, and we continued to benefit from major secular trends in machine learning, cloud and the Internet of Things."

41.    Similarly, Defendant Frankola highlighted the fact that the Company had added "45 net new Global 8000 customers in the quarter" and represented that, "[i]n Q2, many of these customers increased their utilization of the Cloudera platform, fueling growth and driving our net expansion rate to 140% for the quarter."  Defendant Frankola also stated "[w]e continue to be successful in acquiring and growing large customers, and the benefits of our land-and-expand model are evident in our improving margins and cash flow."

42.    Defendant Frankola also claimed that the Company's plan to decrease spending on new revenues, and ultimately move towards profitability, was working.  He stated in relevant part:

> Sales and marketing expense was $49.6 million for the second quarter or 55% of total revenue. This compares to 70% of revenue in the year-ago period. This progress is consistent with our expectations. The unique dynamics of the Cloudera model, with higher customer acquisition costs offset by much higher customer lifetime value produces improving sales efficiencies as our customers grow.

43.    In response to an analyst question, Defendant Reilly stated that the Company's salesforce was executing exceptionally well, and that its focus on large customers was working. Defendant Reilly stated in pertinent part:

> We continually increase our focus on going after the Global 8000.  It's how we have aligned our sales force.  It's how we drive our marketing.  It's how we work with our partners in identifying industry-specific solutions, and I think that focus has really benefited us in capturing and is – we've executed very well.  I think our competitors have made some missteps and that created some opportunities where we gained some more wins. But I would take greater pride in just our focus. All of R&D is going after the needs of large enterprises in these hybrid and multi-cloud environments, and that is differentiating us.

44.    On September 12, 2017, Defendants caused the Company to file its 2Q18 results

on Form 10-Q, which was signed by Defendant Reilly and Defendant Frankola.

45.     On September 15, 2017, the Company announced a follow-on stock offering, in which it ultimately sold over 15.4 million common shares at $16.45 per share, for total gross proceeds of $253 million (the "SPO").  The vast majority of shares sold in the SPO were by Company insiders, including more than $9 million worth of shares sold by Defendant Olson.

46.     On December 7, 2017, Defendants caused the Company to issue a press release announcing its 3Q18 financial results, stating that the Company had achieved total revenues of $94.6 million (a 41% increase) and subscription revenue of $78.1 million (a 48% increase) for the quarter.  Defendant Reilly was quoted in the press release as stating: "[w]e had another strong quarter in Q3, exceeding expectations on financial measures while increasing our competitive advantage in cloud analytics through significant new product innovation."  He further claimed that Cloudera was "now at the scale where we can execute on multiple fronts concurrently" and that its "financial model is exhibiting consistent operating leverage as we march toward operating cash flow break-even."

47.     Defendant Frankola also claimed that the Company's plan to decrease spending on new revenues, and ultimately move towards profitability, was working.  He stated in pertinent part:

> Sales and marketing expense was $49.6 million for the second quarter or 55% of total revenue. This compares to 70% of revenue in the year-ago period. This progress is consistent with our expectations. The unique dynamics of the Cloudera model, with higher customer acquisition costs offset by much higher customer lifetime value produces improving sales efficiencies as our customers grow.

48.     In response to an analyst question, Defendant Reilly stated that the Company's salesforce was executing exceptionally well, and that its focus on large customers was working. He stated in pertinent part:

We continually increase our focus on going after the Global 8000. It's how we
have aligned our sales force. It's how we drive our marketing. It's how we work
with our partners in identifying industry-specific solutions, and I think that focus
has really benefited us in capturing, and is – we've executed very well. I think our
competitors have made some missteps and that created some opportunities where
we gained some more wins. But I would take greater pride in just our focus. All of
R&D is going after the needs of large enterprises in these hybrid and multi-cloud
environments, and that is differentiating us.

49.     On September 12, 2017, Cloudera filed its 2Q18 results on Form 10-Q, which was

signed by Defendant Reilly and Defendant Frankola.

50.     On September 15, 2017, Defendants caused the Company to announce a follow-

on stock offering, in which it ultimately sold over 15.4 million common shares at $16.45 per

share, for total gross proceeds of $253 million (the "SPO"). The vast majority of shares sold in

the SPO were by Company insiders, including more than $9 million worth of shares sold by

Defendant Olson.

51.     On December 7, 2017, Defendants caused the Company to issue a press release

announcing its 3Q18 financial results, stating that the Company had achieved total revenues of

$94.6 million (a 41% increase) and subscription revenue of $78.1 million (a 48% increase) for

the quarter.  Defendant Reilly was quoted in the press release as stating: "[w]e had another

strong quarter in Q3, exceeding expectations on financial measures while increasing our

competitive advantage in cloud analytics through significant new product innovation."   He

further claimed that Cloudera was "now at the scale where we can execute on multiple fronts

concurrently" and that its "financial model is exhibiting consistent operating leverage as we

march toward operating cash flow break-even."

52.     On the earnings call to discuss the 3Q18 results, Defendant Olson stated in his

prepared remarks that Cloudera was "pleased with [its] growing partnerships with Amazon and

Microsoft as they realize the Company's platform built on SDX can bring large enterprises with

mission critical applications to their cloud infrastructure."

53.     Defendant Reilly followed up by highlighting the Company's purported growth and increasing capture of a dynamic market. He stated in pertinent part:

> The market opportunity is large, and the innovation we are delivering is essential to capturing more of it.  We're in the early stages of a high-growth market with a rate and pace of change that is staggering.  Our team is navigating it well with consistent execution, and we're confident in our strategy.  We continue to gain share with the most valuable customers, large enterprises and public sector entities globally. And we're pleased with the operating leverage demonstrated in our business model.  We remain focused on the long term, and will continue to invest in our partners, the community and in developing differentiated technology.

54.     Defendant Frankola, meanwhile, stated that the Company was only "4 to 6 quarters away from estimated cash flow positive."

55.     On December 8, 2017, Defendants caused the Company to file its 3Q18 results on Form 10-Q, which was signed by Defendant Reilly and Defendant Frankola.

56.     The statements referenced above were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)     that Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud;

(b)     that Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses;

(c)     that, as a result of (a) and (b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based

platform;

(d)     that Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers;

(e)     that relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest;

(f)     that, as a result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing; and

(g)     that, as a result of (a)-(f), Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows for the foreseeable future.

57.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") required the IPO Prospectus and the SPO Prospectus to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." Defendants' failure to disclose the facts listed above was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations. This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately

disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Cloudera common stock speculative or risky.

58.     Then, after market on April 3, 2018, Cloudera issued a press release announcing its Q4 and FY 2018 financial results.  Cloudera stated that it had achieved total revenues of $103.5 million and subscription revenues of $84.3 million, with a negative operating cash flow of $22 million during the quarter.  Most concerning, the Company provided a disappointing outlook for fiscal 2019, with total revenues of only $435 million to $445 million, representing a sharp deceleration in growth.  In addition, the Company stated that it expected negative operating cash flows for the year of between $370 million and $375 million and non-GAAP losses of between $0.62 to $0.59 per share.  These disappointing figures contradicted Defendants' prior positive statements and were all the more surprising as they had come so soon after the SPO and less than a year after Cloudera had gone public.

59.     On the earnings call to discuss the FY 2018 results, Defendants revealed that a sharp slowdown in Cloudera's new expansion bookings had occurred in 2018, suggesting that its "land and expand" model was much more limited than advertised. Defendant Reilly also essentially confirmed that Cloudera's customers were not growing their use of the Company's products at a sufficient rate and announced a plan to target "a subset of the Global 8000" in order to "optimize [its] go-to-market efforts for the greatest return," which would "enable [Cloudera] to grow faster and generate cash sooner."  In addition, Defendant Reilly announced a substantial reorganization of the Company's salesforce and the appointment of a new head of Global Field Operations.

60.     On this news, the price of Cloudera common stock fell 40% to $13.29 per share on abnormally high volume of nearly 28 million shares.

**The Company Merges With Hortonworks**

61.     Because investors did not know the full truth about the Company's increasingly difficult sales and earnings environment, however, the price of Cloudera stock remained artificially inflated. Instead, Defendants continued to mislead investors about the true state of Cloudera's business.  For example, on the FY 2018 earnings call, Defendant Reilly stated that "Cloudera is well positioned to continue to grow" and "the changes we've undertaken have strengthened our prospects."  Similarly, when an analyst asked whether the dramatic slowdown in bookings and revenue growth was due to lessening demand for Cloudera's products as rivals increased competition, Defendant Reilly flatly rejected any long-term demand problems.  He responded: "[s]o I see nothing that gives me concern about the market.  […]  No changes in the competitive landscape nor end market demand."  In fact, Defendant Reilly claimed that new product offerings like cloud-based data management were a "tremendous tailwind" because Cloudera had "figured out how to win in that market and then stay focused on large enterprises who value our enterprise features."  He even claimed that Cloudera was "better than Amazon on Amazon" because its "products on Amazon are integrated better and operate better than Amazon's own offerings."  On the same call, Defendant Frankola stated that Cloudera was "still confident [it would] get to that cash flow-positive in 2020," indicating a substantial growth in billings with proportionately lower spend in coming quarters.

62.     On April 4, 2018, Defendants caused the Company to file its FY 2018 results on Form 10-K, which was signed by Defendants Reilly, Frankola and Olson.

63.     In the quarters that followed Defendants' announcement of FY 2018 results, they continued to represent that Cloudera's new sales and marketing plan and decision to focus on customer expansions was succeeding.  For example, on June 6, 2018, Defendants caused the

Company to issue a press release announcing its 1Q19 financial results, stating that the Company had achieved total revenues of $102.7 million (a 29% increase) and subscription revenue of $85.9 million (a 33% increase) for the quarter.  These figures were in-line with or slightly above the Company's prior guidance.

64.     On the earnings call to discuss the 1Q19 results, Defendant Reilly stated that the Company's previously announced strategic moves had "gone as anticipated" and that the changes would "enhance the company's posture for sustained long-term growth." Later in response to an analyst question, Defendant Reilly stated that Cloudera would "compete very effectively" against competition such as Microsoft, Google and Amazon because "[w]hen we are competing in the cloud, we have so many advantages."

65.     Also, on June 6, 2018, Defendants caused the Company to file its 1Q19 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

66.     On September 5, 2018, Cloudera issued a press release announcing its 2Q19 financial results, stating that the Company had achieved total revenues of $110.3 million (a 23% increase) and subscription revenue of $93.1 million (a 26% increase) for the quarter.  These figures exceeded the Company's prior guidance. Defendant Reilly was quoted in the release as stating: "[i]n Q2 we made substantial progress in our product and go-to-market transitions, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our market."

67.     On the earnings call to discuss the results, Defendant Reilly reiterated that the Company's new sales strategies and initiatives were working.  He stated in pertinent part:

> [I]n Q2, we made substantial progress in our product and our go-to-market initiatives, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our markets. I am pleased with our execution in the quarter and look forward to continued improvement in

performance as all of our initiatives are fully implemented.

It is encouraging to see the changes we are making being validated by customers and partners. In addition, the secular tailwinds in our market remain intact and demand is strong across our solution set.

68.     Defendant Frankola likewise stated: "[w]e had a strong quarter across the board, especially concerning the key initiatives of our transition plan." He continued, "[T]he 128% net expansion rate in Q2 was better than expected due to improved renewal rates and increased focus on customer success. Collectively, these measures best reflect our ability to both acquire target customers and advance customers along the journey towards increasingly attractive unit economics."

69.     Defendant Reilly later echoed these sentiments, stating that in all three major areas of focus for the Company it was "doing extremely, extremely well."  He also claimed that Cloudera was "putting in place [a] channel to allow [it] to address a broader market at a lower acquisition cost and support cost."

70.     On September 6, 2018, Defendants caused the Company to file its 2Q19 results on Form 10-Q, which was signed by Defendant Reilly and Defendant Frankola.

71.     On October 3, 2018, Cloudera announced that it had entered into a definitive merger agreement with its primary competitor in the Hadoop data analytics space, Hortonworks, Inc. (the "Hortonworks Merger"). In the stock-for-stock deal, valued at $5.2 billion, Hortonworks shareholders would own 40% of the combined Company and receive 1.305 common shares of Cloudera for each share of Hortonworks stock they owned.

72.     In the press release announcing the deal, Defendant Reilly was quoted as stating that the "businesses are highly complementary and strategic" and would "deliver the industry's first enterprise data cloud from the Edge to AI" and "advance our shared commitment to

customer success in their pursuit of digital transformation."

73.     On an investor call to discuss the merger, Defendant Reilly stated that the "primary motivation for this combination is to accelerate innovation" and the "combined company will have substantial scale, resources and talent to do more faster."  He continued: "[b]eyond accelerating  innovation in cloud technology, the transaction also produces significant financial benefits, including large cost synergies."

74.     Defendant Frankola claimed that the merger would lead to significant synergies and lower costs, stating in pertinent part:

> The 2 companies together combine for almost [$0.75 billion] of revenue, growing in excess of 30% a year.  These are all previously reported numbers presented as of our respective Q2s. We expect to close the merger in calendar Q1 of next year so the pro forma combined will be meaningfully larger.  The important point is that the day the merger closes, we will have significant scale and growth.

> This combination will unlock powerful synergies. The deal was driven primarily by the strategic merit that Tom and Rob discussed. These benefits will likely generate additional revenue opportunity.  However, we have not built any potential revenue upside into our financial model.  Given the strategic fit between the companies, we are confident that there will be significant opportunities to improve both the efficiency and the effectiveness of our internal operations.  We expect these improvements to drive more than $125 million of cost synergies per year while allowing additional investment in growth areas including IoT, hybrid cloud, data warehousing, machine learning and AI.

> * * *

> As a finance person, this is where I get most excited. This transition significantly accelerates the path to our long-term model. We expect to continue to grow quickly while generating significant cash flow. Calendar year '19, or fiscal year '20 for Cloudera, will be the year where we integrate the companies and take steps to generate more than $125 million in annual cost synergies.  Calendar year '20 or fiscal year '21 shows what the new company is expected to look like once we have achieved most of the savings.  At that time, we expect to be more than $1 billion in revenue, growing at more than 20% per year and generating more than 15% operating cash flow margin.

75.     On December 5, 2018, Defendants caused the Company to issue a press release

announcing its 3Q19 financial results, stating that the Company had achieved total revenues of $118.2 million (a 25% increase) and subscription revenue of $99.7 million (a 28% increase) for the quarter. These figures again exceeded the Company's prior guidance. Defendant Reilly was quoted in the release as stating:

> We are pleased with our execution in Q3 and our progress on the strategic combination we have announced with Hortonworks. Pre-closing merger integration planning is going well. And more importantly, we are very encouraged by the reception that our plans are receiving from customers, partners and the developer community. Together, we will enhance our competitiveness, accelerate our momentum in cloud innovation, and provide a comprehensive solution-set for customers, from the Edge to AI.

76. On the earnings call to discuss the results, Defendant Reilly stated: "[w]hile much of our focus is on long-term strategy and merger planning, it is reassuring to see continued favorable results from the go-to-market changes we initiated a few quarters ago." He also once again described the purported benefits of the merger with Hortonworks in his prepared remarks, claiming that Cloudera had "identified the potential for even greater synergies than assumed" and stated in pertinent part:

> The combination of Cloudera and Hortonworks will fuel innovation at a greater rate and pace than we could have achieved as stand-alone companies. The new Cloudera will have the scale, resources and talent to do more and do it faster. Our significant investments in engineers and committers working with the open-source community will enable us to innovate on key technologies ranging from real-time streaming at the Edge to an enterprise-grade cloud-native data warehouse and a new platform to industrialize AI, all delivering the industry's first enterprise data cloud.
>
> * * *
>
> The combination of Cloudera and Hortonworks creates a clear market leader in industry standard for a modern data platform, producing significant advantages for customers and partners. Establishing the industry standard minimizes risk and improves clarity for customers. It simplifies customers' evaluation processes and speeds decision-making. The standard also focuses the open-source communities' innovative efforts.

* * *

Last but certainly not least are the significant financial synergies produced by merging the 2 companies.  We expect to generate substantially more cash in a shorter time frame than if we had remained independent companies. We will also accelerate the achievement of our long-term target model.  Although the merger will generate large cost savings, it is important to note that we intend to invest some of those savings into enhanced go-to-market capabilities and the technological innovations mentioned previously.

77.     In response to an analyst question, Defendant Reilly brushed off concerns that Cloudera's platform was becoming outdated, stating, "Cloudera is in a very unique competitive position to capture the market growth where the market is headed."

78.     Defendant Frankola stated that Cloudera had another good quarter "across the board" and its solid customer metrics "reflect [the Company's] ability to both acquire target customers and advance customers along a journey towards increasingly attractive unit economics." He also claimed that Cloudera had already achieved "20% of merger synergies before the deal has closed."  Later, Defendant Frankola stated: "I mean, from my standpoint, everything that I see gives us confidence . . . everything that we see happening with the merger with Hortonworks, the ability to cross-sell product – I don't need to go through the whole pitch of innovation and cloud and so forth, all of that will be a tailwind for positive growth in net expansion rates."

79.     On December 6, 2018, Cloudera filed its 3Q19 results on Form 10-Q, which was signed by Defendant Reilly and Defendant Frankola.

80.     The statements referenced above were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)      that Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud, and that such adverse competitive trends had accelerated;

(b)      that Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses;

(c)      that, as a result of (a)-(b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform;

(d)      that Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers;

(e)      that relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest;

(f)      that, as a result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing;

(g)      that, as a result of (a)-(f), Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows for the foreseeable future;

(h)       that the primary motivation for the Hortonworks Merger was to generate growth through the acquisition of existing customers of Hortonworks, because Defendants realized that generating organic sales growth for the Company's increasingly dated product

offerings was becoming exceedingly difficult; and

(i)     that the purported synergies and other benefits of the Hortonworks Merger had been materially overstated, as the merger was not generating, nor was it likely to generate, the cost savings or revenue increases represented to investors.

81.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") required the 2018 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." Defendants' failure to disclose the facts listed above was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.  This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Cloudera common stock speculative or risky.

82.     On January 3, 2019, the Company announced the close of the Hortonworks Merger.

83.     Then, after market on March 13, 2019, Defendants caused the Company to issue a press release announcing its Q4 and FY 2019 financial results.  Cloudera stated that it had achieved total revenues of $144.5 million and subscription revenue of $123 million.  However, the Company provided weak guidance for 1Q20, the first fiscal quarter after the completion of

the Hortonworks Merger.  The Company stated that it expected 1Q20 total revenues of only between $187 million and $190 million and subscription revenues of between $154 million and $156 million, while it expected FY 2020 total revenues of only between $835 million and $855 million and subscription revenues of between $695 million and $705 million. In addition, the Company stated that it expected negative operation cash flow of $30 million to $40 million for the year.

84.     On the earnings call to discuss the FY 2019 results, Defendant Frankola revealed that the merged entity would need to take a $62 million "haircut" due to purchase price accounting adjustments and also a $28 million write-down of deferred commission expenses.  In addition, he stated that differences in billing periods between the companies would reduce 2020 cash flows by $125 million as the legacy companies reconciled their billing cycles.

85.     On this news, the price of Cloudera common stock fell nearly 20% to $11.71 per share on abnormally high volume of nearly 38 million shares.

86.     However, because investors did not know the full truth about the Company's increasingly difficult sales and earnings environment and the Hortonworks Merger, the price of Cloudera stock remained artificially inflated.  Indeed, Defendants dismissed the disappointing guidance as not related to the fundamentals of the Company and claimed that Cloudera was successfully outcompeting its rivals. For example, on the FY 2019 earnings call, Defendant Frankola stated that Cloudera still "anticipate[d] significant improvements in R&D, sales and marketing and G&A expense ratios as [the Company] complete[d] [its] merger synergy actions." Similarly, Defendant Reilly stated: "Merger integration is going well and ahead of schedule." In response to an analyst question, he also dismissed competitive concerns from other providers such as Amazon, stating "we feel very strong that market is moving in our direction around the

hybrid multi-cloud, and then our functionality is best-in-class."

87.     Then, after market on June 5, 2019, Cloudera issued a press release announcing disappointing 1Q20 results. The Company stated that its first quarter revenues were $187.5 million, but that several customers had elected to "postpone renewal and expansion" of their subscription agreements. The Company also announced that its losses from operations had ballooned to $103.8 million, roughly double the year-over-year period. In addition, Cloudera revealed that its highest-spending customers were essentially flat for the quarter, that middle-spend customers had declined sequentially, and that it was suffering an elevated dollar churn rate of 15%. In other words, the Company was effectively losing business, notwithstanding its recent merger with Hortonworks, its vaunted "land and expand" strategy, and the fact that the Company had spent a staggering $119 million on sales and marketing during the quarter.  The Company also slashed its full-year outlook, reducing total revenue guidance by $90 million and stating it expected recurring revenue growth of only 0% to 10% for the year (compared to 18% to 21% in the prior issued guidance) and that it now expected to suffer a negative cash flow from operations of between $75 million and $95 million for the year, more than double the amount stated in the previously issued guidance.  The same day, Cloudera announced that its CEO, Defendant Reilly, would be abruptly retiring from the Company.

88.     Analysts questioned the reason for the abrupt slowdown, pointing to increased competition, especially by large cloud providers such as Google, Microsoft, and Amazon. On the earnings call to discuss the results, one analyst wondered whether customers were "simply migrating to a different form of data architecture" and abandoning the Company's Hadoop-based platform as obsolete.

89.     Analyst reaction was also swift and severe.  For example, Needham downgraded

Cloudera stock from "Strong Buy" to "Hold," calling the 1Q20 results a "thesis changer." Similarly, an analyst report by Stifel described Cloudera's shocking cut to guidance as "one of the deepest cuts we can remember in the software space since the dot.com meltdown."

90.     On this news, the price of Cloudera common stock fell 40% to just $5.21 per share on abnormally high volume of over 57 million shares.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

92.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

93.     Plaintiffs are current owners of Cloudera stock and have continuously been an owner of Cloudera stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

94.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

95.     The Cloudera Board is currently comprised of Defendants Cole, Cormier, Fenton, Hammonds, Klasumeyer, Stankey, Reilly and Bearden.  Thus, Plaintiffs are required to show that a majority of the Demand Defendants, *i.e.*, four (4), cannot exercise independent objective

judgment about whether to bring this action or whether to vigorously prosecute this action.

96.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

97.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.   For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

99.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

100.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

101.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

102.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Reilly**

103.    Defendant Reilly is not disinterested or independent, and therefore, is incapable of considering demand because Reilly (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Reilly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

104.    This lack of independence and financial benefits received by Defendant Reilly renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

105.    In addition, Defendant Reilly is a defendant in the securities class action entitled *Christie v. Cloudera, Inc., et al.*, Case No. 5:19-cv-3221 (N.D. Cal.) ("Securities Class Action").

106.    As such, Defendant Reilly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Hammonds**

107.    The Company has received approximately $13.6 million for the year ended

January 31, 2019 in payments from Deutsche Bank AG for subscriptions and services in the ordinary course of business.  Defendant Hammonds was a former Member of the Management Board and Group Chief Operating Officer of Deutsche Bank AG.

**Defendant Schooler**

108.    Defendant Schooler owns 9.5 of the Company's outstanding shares.  Further, Defendant Schooler was designated to the Company's Board by Intel Corporation.  The Company's 2019 Proxy also states that Defendant Schooler is not independent.

**Defendants Klausmeyer, Fenton and Stankey**

109.    Defendants Klausmeyer, Fenton and Stankey are members of the Company's Audit Committee.

110.    Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing and discussing "with management, Cloudera's quarterly results and discuss the related earnings press release prior to distribution to the public. Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financing information."

111.    Defendants Klausmeyer, Fenton and Stankey, and during the times each served on this committee, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Klausmeyer, Fenton and Stankey face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Cormier, Fenton, Klausmeyer and Bearden**

112.    Defendants Cormier, Fenton, Klausmeyer and Bearden were all members of the board of directors of Hortonworks, which merged with Cloudera in January 2019.

113.    Because of their previous business relationships, there is a reasonable doubt as to these Defendants' disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## DAMAGE TO THE COMPANY

114.    Defendants' faithless acts and omissions, breaches of fiduciary duty and violations of the federal securities laws and state law have severely damaged, and will continue to damage, Cloudera.   By engaging in the aforementioned unlawful scheme, Defendants: (i) caused Cloudera to issue materially false and misleading statements to its shareholders and the investment community; (ii) caused Cloudera common stock to trade at artificially inflated prices, exposing the Company to millions of dollars in potential civil, regulatory and criminal liability to investors and regulators, including the SEC; and (iii) exposed Cloudera to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to defend regulatory investigations and shareholder litigation.

115.    Moreover, these actions, have irreparably damaged the Company's goodwill and reputation.   For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

116.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

117.    Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

119.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to Cloudera, Defendants failed to disclose that: (a) Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud, and that such adverse competitive trends had accelerated; (b) Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses; (c)  as a result of (a)-(b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform; (d) Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers; (e) relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest; (f) as a

result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing; (g) as a result of (a)-(f), Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows for the foreseeable future; (h) the primary motivation for the Hortonworks Merger was to generate growth through the acquisition of existing customers of Hortonworks, because Defendants realized that generating organic sales growth for the Company's increasingly dated product offerings was becoming exceedingly difficult; and (i) the purported synergies and other benefits of the Hortonworks Merger had been materially overstated, as the merger was not generating, nor was it likely to generate, the cost savings or revenue increases represented to investors.

120.    Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

121.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

122.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment
### <u>Against Defendant Olson</u>)

123.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

124.   As a result of the conduct described above, Defendant Olson have been unjustly enriched at the expense of the Company.

125.   Defendant Olson sold Cloudera stock for a profit during the period of deception, misusing confidential non-public corporate information.

126.   On September 15, 2017, the Company announced a follow-on stock offering, in which it ultimately sold over 15.4 million common shares at $16.45 per share, for total gross proceeds of $253 million.  The vast majority of shares sold in this offering were by Company insiders, including more than $9 million worth of shares sold by Defendant Olson.

127.   Further, Defendant Olson received millions of dollars in cash bonuses and equity incentive compensation by causing Cloudera to issue materially false and misleading statements to the investment community that exposed it to millions of dollars in potential liability to investors and regulators.  Defendant Olson should be required to disgorge the gains which he obtained and/or will otherwise unjustly obtain at the expense of the Company.  A constructive trust for the benefit of the Company should be imposed thereon.

128.   All the stock sales proceeds and cash bonus and equity compensation payments provided to Defendant Olson were at the expense of the Company.  The Company received no benefit from these stock sales proceeds and payments.  The Company was damaged by such stock sales proceeds and payments.

129.   Plaintiffs, as shareholders and representatives of the Company, seek restitution

from Defendant Olson, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant Olson, as a result of his wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

130.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

131.   During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose that (a) Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud, and that such adverse competitive trends had accelerated; (b) Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses; (c) as a result of (a)-(b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform; (d) Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers; (e) relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest; (f) as a result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing; (g) as a result of (a)-(f), Cloudera had materially diminished sales opportunities and

prospects and could not generate annual positive cash flows for the foreseeable future; (h) the primary motivation for the Hortonworks Merger was to generate growth through the acquisition of existing customers of Hortonworks, because Defendants realized that generating organic sales growth for the Company's increasingly dated product offerings was becoming exceedingly difficult; and (i) the purported synergies and other benefits of the Hortonworks Merger had been materially overstated, as the merger was not generating, nor was it likely to generate, the cost savings or revenue increases represented to investors.

132.    Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

133.    As  alleged herein, Cloudera and Director Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Director Defendants, by virtue of their receipt of information reflecting the true facts regarding Cloudera, their control over, and/or receipt and/or modification of Cloudera's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cloudera, participated in the fraudulent scheme alleged herein.

134.    Director Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period

without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants.

135.    The Director Defendants were each members of Cloudera's Board during the aforesaid time period.  Based on their roles at Cloudera, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

136.    At a minimum, the Director Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Cloudera, the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

137.    Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

138.    The allegations above also establish a strong inference that Cloudera, as an entity, acted with corporate scienter throughout the Relevant Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth

because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Cloudera's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Cloudera maintained and/or increased its artificially inflated common stock price throughout the Relevant Period.

139.    As such Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

       (a)    Employed devices, schemes, and artifices to defraud; and

       (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

**FOURTH CAUSE OF ACTION**

**(Derivative Claim for Violations of Section 20(a) of the Exchange Act
Against Defendants Reilly and Frankola)**

141.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

142.    This Count is asserted on behalf of the Company against Defendants Reilly and Frankola for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

143.    During their tenure as executive officers, Defendants Reilly and Frankola were controlling person of all officers of the Company within the meaning of Section 20(a) of the

Exchange Act.  By reason of their control, Defendants Reilly and Frankola had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendants Reilly and Frankola were able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

144.    In their capacity as the senior executives, Defendants Reilly and Frankola had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendants Reilly and Frankola agreed with their course of conduct.

145.    As a result of the foregoing, Defendants Reilly and Frankola, individually, were controlling persons of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 30, 2019

O'KELLY ERNST & JOYCE, LLC

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

OF COUNSEL:

GAINEY McKENNA & EGLESTON
Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiffs*